7 Cal.App.4th 1966 (1992)
10 Cal. Rptr.2d 15
THE PEOPLE, Plaintiff and Respondent,
v.
SEKOU KWANE THOMPSON, Defendant and Appellant.
Docket No. B055659.
Court of Appeals of California, Second District, Division Seven.
July 15, 1992.
*1968 COUNSEL
Robert Derham, under appointment by the Court of Appeal, for Defendant and Appellant.
Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Robert F. Katz and Kristofer Jorstad, Deputy Attorneys General, for Plaintiff and Respondent.
*1969 OPINION
WOODS (Fred), J.
Convicted by jury of first degree murder (Pen. Code,[1] §§ 187, 189; count I), igniting a destructive device causing death (§ 12310, subd. (a); count III), and igniting a destructive device causing bodily injury (§ 12309; count IV), appellant contends: (1) section 12310, subdivision (a) requires that an aider and abettor have an intent to kill; (2) his confession was improperly admitted; (3) victim photographs should not have been admitted; and (4) the trial court failed to exercise sentencing discretion. We reject all but appellant's fourth contention, affirm the three convictions but reverse the sentences on counts I and III and remand the matter to the trial court for resentencing.

PROCEDURAL AND FACTUAL BACKGROUND
There being no insufficiency of evidence claim, we synopsize the evidence and do so with a perspective favoring the judgment. (People v. Barnes (1986) 42 Cal.3d 284, 303-304 [721 P.2d 110].)
It was about 11:30 p.m., July 3, 1988, when Lisa Lee and her two-year-old son Dionsa returned home after an evening at grandmother's house. Lisa gave Dionsa a bath and brought him to his bedroom  the front bedroom, closest to the street. The lights were on and only thin curtains covered the two windows. By now it was almost midnight. Dionsa, naked from his bath, was on his bed jumping up and down. Lisa was reaching for her son's pajamas, her side to the windows, when she heard the window break. She looked at the window and saw a second "cocktail"  a "fireball"  fly into the room and roll under the bed. The bed went up in flames and she heard her "little boy screaming 'cause he couldn't get off the bed." Dionsa was burning from the neck down. He jumped off the end of the bed and ran into the hall. Lisa ran after him, tripped him, and by patting him and lying on top of him, put out the flames. With her boyfriend's help, she carried Dionsa outside. He was "still sizzling"  you could hear it.
Paramedics transported Dionsa to Martin Luther King Hospital. After a few hours he was transferred to the UCLA Burn Center and then, after a few days, to the burn institute in Boston. He died there on July 14.
About a week later, on July 19, 1988, appellant confessed to aiding and abetting two friends who had filled two 40-ounce beer bottles with gasoline, inserted rag wicks, ignited them, and threw them through the victim's bedroom window.
*1970 A multicount information was filed against appellant and two codefendants. Appellant's motion to sever his trial was granted. A jury convicted him of first degree murder (count I), igniting a destructive device causing death (count III), igniting a destructive device causing bodily injury (count IV), and acquitted him of arson causing great bodily injury (count II). He was sentenced to concurrent state prison terms of 25 years to life (count I), life without possibility of parole (count III), and 7 years (count IV).

DISCUSSION

1. Appellant contends section 12310, subdivision (a) requires that an aider and abettor have an intent to kill.

(1) Appellant concedes that section 12310, subdivision (a) does not expressly require that an aider and abettor have an intent to kill. The section provides: "(a) Every person who willfully and maliciously explodes or ignites any destructive device or any explosive which causes the death of any person is guilty of a felony, and shall be punished by imprisonment in the state prison for life without possibility of parole."
But, he argues, this section "should be read together" with section 190.2 (the murder special circumstance section) because the described conduct "is the same as ... section 190.2, subdivision (a)(6)" where aider/abetter intent to kill is required.
We are not persuaded. Although our Supreme Court initially construed section 190.2 as containing an intent to kill element (Carlos v. Superior Court (1983) 35 Cal.3d 131 [197 Cal. Rptr. 79, 672 P.2d 862]) it soon acknowledged its mistake. (People v. Anderson (1987) 43 Cal.3d 1104, 1143 [240 Cal. Rptr. 585, 742 P.2d 1306].) Anderson overruled Carlos and held: "intent to kill is not an element of the felony-murder special circumstance; but when the defendant is an aider and abetter rather than the actual killer, intent must be proved." (Id. at p. 1147.)
This latter Anderson holding was based upon section 190.2, subdivision (b). It provides: "(b) Every person whether or not the actual killer found guilty of intentionally aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting any actor in the commission of murder in the first degree shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated in paragraphs (1), (3), (4), (5), (6), (7), (8), (9), (10), (11), (12), (13), (14), (15), (16), (17), (18), or (19) of subdivision (a) of this section has been charged and specially found under *1971 Section 190.4 to be true. The penalty shall be determined as provided in Section 190.1, 190.2, 190.3, 190.4, and 190.5." (Italics added.)
The subject section, section 12310, does not contain the emphasized language of section 190.2 which explicitly distinguishes between the "actual killer" and an aider/abettor. Section 12310, by contrast, does not distinguish between the "actual" igniter of an explosive device and his aider/abetter. The section states that "Every person who willfully and maliciously explodes or ignites any destructive device or any explosive which causes the death of any person is guilty of a felony, and shall be punished by imprisonment the state prison for life without the possibility of parole." (§ 12310, subd. (a).) (Italics added.)
We find the words of section 12310 clear and unambiguous, not requiring resort to extrinsic indicia of intent. (Lungren v. Deukmejian (1988) 45 Cal.3d 727, 735 [248 Cal. Rptr. 115, 755 P.2d 299].) By expressly specifying a mens rea ("willfully and maliciously") applicable to "every person," the section is not susceptible of the meaning that some people must, additionally, harbor an intent to kill.
Further, appellant's premise that section 190.2, subdivision (a)(6)[2] and 12310, subdivision (a) are identical is mistaken. The former only requires that the defendant "reasonably should have known [of] a great risk" while the latter requires that the defendant act "willfully and maliciously." Finally, conduct encompassed by section 190.2 subjects the actor to the death penalty. Conduct encompassed by section 12310 does not.

2. Appellant contends his confession was improperly admitted.

(2) Appellant does not contend the interrogating officer, Detective Callian, failed to advise him of his Miranda rights, or that he failed to understand them, or that he did not waive them. Rather, appellant contends that the advisement and waiver were not "reasonably contemporaneous" with his confession. (People v. Bennett (1976) 58 Cal. App.3d 230, 238 [129 Cal. Rptr. 679].)
"Whether one warning is sufficient to cover a subsequent interrogation is a factual question in each case." (People v. Bynum (1971) 4 Cal.3d 589, 600 [94 Cal. Rptr. 241, 483 P.2d 1193], overruled on other grounds by People v. Williams (1976) 16 Cal.3d 663, 669 [128 Cal. Rptr. 88, 547 P.2d 1000].)
*1972 The facts we review are those testified to by Detective Callian at the preliminary hearing. Appellant, at the preliminary hearing, moved to exclude his confession. The magistrate denied the motion. In superior court appellant, relying upon the transcript of the preliminary hearing, moved to set aside the information (§ 995), again claiming his confession was inadmissible. Superior Court Judge Croft denied the motion. Appellant then sought to suppress his confession (§ 1538.5), again relying upon the transcript of the preliminary hearing. Superior Court Judge Croft also denied this motion. When the case was transferred to Superior Court Judge Dunbar for trial, appellant, still relying only on the preliminary hearing transcript, brought a fourth motion (Evid. Code, § 402) to exclude his confession. Judge Dunbar denied the motion. Later, appellant moved for the fifth time to exclude his confession, still relying upon the transcript of the preliminary hearing. Judge Dunbar entertained but denied appellant's "motion to reconsider."
The facts, as testified to by Detective Callian, are these. On July 19, 1988, Detective Callian went to 1545 1/2 South Gramarcy Place to interview two young women in connection with the instant murder. He arrived about 8:30 a.m. and was informed by the woman of the house (Willie Fay Cotton) that they were not home but her son (former codefendant Anthony Snead) and appellant were. Detective Callian said he'd like to talk to them. They came into the living room and Detective Callian described the murder he was investigating and asked them if they would talk to him at the station. Their attitude was "fine ... open ... and cooperative." They agreed. They arrived at Southwest Station approximately 9:15 a.m. In an interview room Detective Callian advised appellant of his Miranda rights. Appellant said he understood and waived each of his rights. During the short interview, about 15 minutes, appellant denied any involvement in the murder. Detective Callian asked appellant if he would take a polygraph and appellant said he would.
Appellant began his polygraph examination approximately noon at Parker Center. After the examination, Detective Callian again interviewed appellant. This interview, which was tape recorded, began at 6:15 p.m. During it, appellant made a confession. At the conclusion of the interview appellant read the statement Detective Callian had written, made corrections, initialled the corrections, and signed the statement.
On this record  which contains only Detective Callian's undisputed testimony that appellant was properly advised of his rights, understood them, and voluntarily waived them  we find no Miranda violation. That approximately nine hours intervened between advisement and confession does not, as a matter of law, vitiate the advisement. "The law does not require that a *1973 defendant be readvised of his rights prior to each separate interrogation." (People v. Johnson (1973) 32 Cal. App.3d 988, 997 [109 Cal. Rptr. 118].) Ten hour intervals (People v. Inman (1969) 274 Cal. App.2d 704, 707-708 [79 Cal. Rptr. 290]), and even next day interrogation (People v. Sievers (1967) 255 Cal. App.2d 34, 37-38 [62 Cal. Rptr. 841]) have been found adequate. (See also People v. Jacobo (1991) 230 Cal. App.3d 1416, 1422-1423 [281 Cal. Rptr. 750].)
We also reject appellant's contention that his confession was the product of an unlawful arrest. Substantial evidence supports the superior court judge's denial of appellant's section 1538.5 motion. Appellant was not placed under arrest until after he had confessed. There was substantial evidence that appellant understood, prior to the time he inculpated himself, he was free to leave and was not being detained by the police.

3. Appellant contends victim photographs should not have been admitted.

(3) Appellant argues that the two admitted victim photographs were irrelevant, gruesome, and prejudicial. He also asserts the testimony of the forensic pathologist, describing the victim's injuries and his cause of death, was cumulative and "served no purpose other than to roil the jury's passion against the perpetrators of the crime." We disagree.
The trial court, before exercising her discretion, examined the many victim photographs proffered by the district attorney. She admitted only one and a portion of another. The forensic pathologist, Doctor Blackbourne, relied upon both to describe to the jury the nature and extent of the victim's burns. We find no abuse of discretion. (People v. Allen (1986) 42 Cal.3d 1222, 1255-1256 [232 Cal. Rptr. 849, 729 P.2d 115].)
But, appellant asserts, by offering to stipulate to the cause of death he rendered irrelevant all victim photographs and expert testimony. This argument, partly supported by authority (People v. Bonin (1989) 47 Cal.3d 808, 848-849 [254 Cal. Rptr. 298, 765 P.2d 460]), has limits.
We have two observations. First, we subscribe to Justice Gardner's wise perception: "(1) murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant; and (2) many attorneys tend to underestimate the stability of the jury. A juror is not some kind of a dithering nincompoop, brought in from never-never land and exposed to the harsh realities of life for the first time in the jury box. There is nothing magic about being a member of the bench or bar which makes these individuals capable of dispassionately evaluating gruesome testimony which, it is often contended, will throw jurors into a paroxysm of hysteria. Jurors are our *1974 peers, often as well educated, as well balanced, as stable, as experienced in the realities of life as the holders of law degrees. The average juror is well able to stomach the unpleasantness of exposure to the facts of a murder without being unduly influenced. The supposed influence on jurors of allegedly gruesome or inflammatory pictures exists more in the imagination of judges and lawyers than in reality." (People v. Long (1974) 38 Cal. App.3d 680, 689 [113 Cal. Rptr. 530].)
Second, a defendant has no right to transform the facts of a gruesome real-life murder into an anesthetized exercise where only the defendant, not the victim, appears human. Jurors are not, and should not be, computers for whom a victim is just an "element" to be proved, a "component" of a crime. A cardboard victim plus a flesh-and-blood defendant are likely to equal an unjust verdict.
The trial court did not abuse its discretion in admitting the victim photographs and the subject testimony. (See People v. Hardy (1992) 2 Cal.4th 86, 199-200 [5 Cal. Rptr.2d 796, 825 P.2d 781]; People v. Sanders (1990) 51 Cal.3d 471, 514 [273 Cal. Rptr. 537, 797 P.2d 561]; People v. Carrera (1989) 49 Cal.3d 291, 329 [261 Cal. Rptr. 348, 777 P.2d 121].)

4. Appellant contends the trial court failed to exercise sentencing discretion.

(4) The Attorney General concedes "the trial court erroneously sentenced appellant to concurrent terms under both counts I and III." The concession is well taken. Section 654 provides that "[a]n act ... made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one...." Appellant's single course of conduct violated both section 187 and section 12310, subdivision (a) but that conduct may be punished under only one provision not both. (People v. Beamon (1973) 8 Cal.3d 625, 639 [105 Cal. Rptr. 681, 504 P.2d 905].)
The Attorney General is less forthcoming in addressing appellant's related and principal contention: the trial court had discretion to impose sentence on either count I (25 years to life) or count III (life without the possibility of parole) but failed to exercise that discretion, thus requiring a reversal and remand. The Attorney General evades the failure to exercise discretion issue and, treating this merely as a case where the trial court attempted to impose maximum punishment, summarily concludes "[u]nder these circumstances, the remedy is for the appellate court to stay the penalty for the less severely punishable offense."
That the trial court did not exercise sentencing discretion cannot be doubted. At the sentencing hearing appellant's counsel urged the trial court *1975 to impose a life sentence with the possibility of parole. The prosecutor argued that "section 12310 is in fact a mandatory sentence to life in prison without the possibility of parole. In fact, there is no discretion." The trial court stated: "I want the record quite clear that in relation to count III, ... the court is not exercising any discretion whatsoever but considers it is bound by the mandatory provisions of count III, so that if there is a question on appeal with regard to that, I have not exercised any discretion in this case."
Notwithstanding that the punishment for section 12310, subdivision (a), (life without the possibility of parole) was greater than that for first degree murder (25 years to life), the trial court had discretion to impose either punishment. (§ 654; People v. Wesley (1970) 10 Cal. App.3d 902 [89 Cal. Rptr. 377]; People v. DeVaney (1973) 33 Cal. App.3d 630 [109 Cal. Rptr. 276]; People v. Mendevil (1978) 81 Cal. App.3d 84 [146 Cal. Rptr. 65]; People v. Bradley (1981) 115 Cal. App.3d 744 [171 Cal. Rptr. 487]; People v. Avila (1982) 138 Cal. App.3d 873 [188 Cal. Rptr. 754]; People v. Barela (1983) 145 Cal. App.3d 152 [193 Cal. Rptr. 257]; People v. Salazar (1987) 194 Cal. App.3d 634 [239 Cal. Rptr. 746]; see also People v. Thompson (1989) 209 Cal. App.3d 1075 [257 Cal. Rptr. 658]; but see People v. Superior Court (Himmelsbach) (1986) 186 Cal. App.3d 524, 539 [230 Cal. Rptr. 890].)
We hold the trial court had a duty to determine which punishment, 25 years to life under count I, or life without possibility of parole under count III, was the more appropriate, to impose that punishment, and to stay the other punishment.
This holding makes it unnecessary to consider appellant's other contentions that the punishment for section 12310, subdivision (a) is cruel and unusual and denies him equal protection.

DISPOSITION
The convictions of counts I, III, and IV are affirmed. The sentences on counts I and III are reversed. The matter is remanded to the trial court for resentencing in accordance with this opinion.
Lillie, P.J., concurred. Johnson, J., concurred in the judgment only.
A petition for a rehearing was denied July 21, 1992, and appellant's petition for review by the Supreme Court was denied October 16, 1992.
NOTES
[1] Unless otherwise noted, all statutory references are to the Penal Code.
[2] It provides: "(6) The murder was committed by means of a destructive device, bomb, or explosive that the defendant mailed or delivered, attempted to mail or deliver, or cause to be mailed or delivered and the defendant knew or reasonably should have known that his act or acts would create a great risk of death to a human being or human beings."